# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **RONALD KIRKWOOD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 1:16-cv-02198** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | ) | **Jeffrey Cole** |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The plaintiff, Ronald Kirkwood, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Kirkwood asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## Introduction

### I.      Procedural History

On May 10, 2012, Mr. Kirkwood completed a Title II application for a period of disability and disability insurance benefits ("DIB").[1]  (R. 200).  On that same day, he also

---

[1] Although Mr. Kirkwood filed a claim for a period of disability and DIB benefits under Title II of the Social Security Act, he alleged a disability onset date of May 31, 2008, which post-dates his "date last insured" of June 30, 2006.  (R. 11).  Pursuant to sections 216(i) and 223 of the Social Security Act, the ALJ found that Mr. Kirkwood's earning record showed he had acquired sufficient quarters of coverage to remain insured through June 30, 2006 (hereinafter, "the date of last insured").  (R. 11).  Thus, in order to be entitled to a period of disability and DIB, Mr. Kirkwood had to establish his disability on or before June 30, 2006. *See, e.g.*, 42 U.S.C. §

filed a Title XVI application for supplemental security income ("SSI"). (R. 204). In both applications, he alleged disability beginning on January 1, 2011. (R. 200, 204). These claims were initially denied on July 18, 2012, and upon reconsideration on January 4, 2013. (R. 116, 120, 132). Thereafter, Mr. Kirkwood filed a written request for a hearing on February 5, 2013. (R. 137). On April 10, 2014, a hearing was conducted by an Administrative Law Judge ("ALJ"). (R. 34). Mr. Kirkwood personally appeared and testified at the hearing, and he was represented by counsel. (R. 34-35). On May 13, 2014, the ALJ denied Mr. Kirkwood's claims for both DIB and SSI, finding him not disabled under the Act. (R. 27-28). The ALJ's decision became the Commissioner's final decision on December 16, 2015, when the Social Security Administration ("SSA") Appeals Council denied Mr. Kirkwood's request for review. (R. 1-3). *See* 20 C.F.R. §§ 404.955. Mr. Kirkwood appealed the decision to the United States District Court for the Northern District of Illinois under 42 U.S.C. § 405(g), claiming that the ALJ improperly evaluated his credibility; failed to account for or weigh examining source opinion; and erred by finding his emphysema does not meet Appendix Listing 3.02(A).

## II.    The Record Evidence

### a.  Vocational Evidence

Mr. Kirkwood was born on March 30, 1965. (R. 26). At the time of his hearing, he was 49 years old. (R. 26). He has an eighth-grade education (R. 83) and his past

---

423(a)(1)(A); 20 C.F.R. § 404.320(b)(2); *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011) (the claimant "had social security disability coverage only until the end of 2003; if she was not disabled by then, she cannot obtain benefits even if she is disabled now"); *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012). Although he was ineligible for DIB because his date last insured had passed, *see Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); 20 C.F.R. §§ 404.315(a), 404.320(b), going forward he will be entitled to SSI because of his limited financial means. *See Moore v. Colvin*, 639 F. App'x 376, 376 (7th Cir. 2016).

relevant work includes jobs as a laborer (R. 241) and a truck driver (R. 83, R. 241). According to his recent Work History Report, Mr. Kirkwood was a self-employed truck driver from 1997-2001. (R. 241). He was then a temporary laborer from 2006 to 2011 (R. 241). He left school after the eighth grade and only returned for driver's education. (R. 73). He did not complete any high school courses. (R. 73). He ability to read and write is minimal; just a few words. (R. 61).

### b. Medical Evidence

In his twelve-page memorandum in support of his motion for summary judgment, Mr. Kirkwood bases his claim that he is entitled to SSI benefits on his medical conditions: emphysema, back and neck pain, and cognitive disorder. He cites to various pieces of medical evidence to support his position: diagnostic test results, including: chest X-rays (R. 498); psychiatric reports (R. 571-576, 730-734); MRI report of his Cervical Spine (R. 716); cervical spine and lumbar spine examination (R. 691, 715-725); and several reports from physicians who treated him. He contends that this evidence proves that the ALJ erred when she failed to find that he was disabled.

### i. Physical Impairments

Since 1997, Mr. Kirkwood has struggled with shortness of breath. (R. 559). He admitted to smoking twenty cigarettes per day for forty years. (R. 559). On February 20, 2009, Mr. Kirkwood was treated at Provena Mercy Center Emergency Department for chest pain. (R. 342). A chest x-ray revealed "emphysematous changes in both lungs; debris / mucus in a few right lower lobe bronchi; passive compressive atelectasis in the right lower lobe." (R. 352). There was no evidence of pulmonary emboli at the first subsegmental pulmonary arterial level. (R. 352).

On August 15, 2009, Mr. Kirkwood was back at Provena Mercy Center Emergency Department for a head injury. (R. 358). He was diagnosed with "alcohol intoxication and facial abrasions." (R. 362). A Facial CT scan revealed no acute hemorrhage, fracture, mass effect or shift. (R. 363). The impression also revealed a complete opacification of the left maxillary sinus and frontal sinus and left clavicle fracture. (R. 14-15, 44, 363). A few days later, on August 18, 2009, Mr. Kirkwood was treated at Provena Mercy Center Emergency Department for a clavicle fracture and difficulty breathing. (R. 368). Mr. Kirkwood complained of difficulty of breathing following a bicycle accident. (R. 368). A PA and lateral chest x-ray showed left clavicular fracture; emphysema without air space considerations; and no pleural effusion or pneumothorax. (R. 374). On August 21, 2009, Mr. Kirkwood returned to Provena Mercy Center Emergency Department complaining of left clavicle pain. (R. 376). He stated his pain medication was not working and he believed it was "not what it is supposed to be". (R. 376-77). Pharmacy confirmed the medication was correct and Mr. Kirkwood was released with additional prescriptions. (R. 377).

In January 2010, Mr. Kirkwood became ill with pneumonia. (R. 381). A chest x-ray, from January 13, 2010, revealed left upper lobe airspace disease; left upper lobe cavitary lesion; and hyperinflation of the lungs. (R. 382). On January 19, 2010, Mr. Kirkwood was hospitalized for left upper lobe cavitary pneumonia. (R. 384). He tested positive for acid-fast bacillus ("AFB"). (R. 626). Laboratory tests revealed Mycobacterium genicum, an atypical type of bacteria that is a non-regular pulmonary TB organism. (R. 626). Diagnostic imaging showed "extensive acute appearing abnormality in left upper lobe; multiple large bilateral apical blebs; centrilobular

emphysema; stable pulmonary nodule; left pleural effusion; bibasilar atelectasis; and multiple old bilateral rib fractures." (R. 390-391). A left upper lobe bronchoscopic biopsy showed bronchial mucosa with chronic inflammation with no evidence of malignancy. (R. 489). Radiological imaging revealed worsening of the dense consolidation in the left upper lobe with cavitation or infected bulla and apparent air bronchogram formation. (R. 435).

From March 2, 2010, through December 7, 2010, Mr. Kirkwood was treated for active Pulmonary Tuberculosis at the Kane County Health Department. (R. 498, 499). Mr. Kirkwood returned to the emergency room in July 2010 for a cough. (R. 521). A chest x-ray revealed patchy interstitial opacities in the left upper love greater than in both perihilar regions in the left lower lobe. (R. 426, 521). Mr. Kirkwood was prescribed a Z-pack. (R. 521). On September 15, 2011, the Kane County Health Department informed Mr. Kirkwood that his treatment for pulmonary tuberculosis was successful. (R. 498). As a precautionary measure, a follow-up CT scan was performed in January 2012. (R. 420). The scan revealed two focal areas of chronic scarring or atelectasis of the left upper lobe. (R. 420). The reviewing radiologist, Dr. Robert Palmer, M.D., concluded this finding was likely due to previous infection, such as chronic tuberculosis and bullous emphysema. (R. 420). Comparing previous radiography from 2010, Dr. Palmer concluded that findings were improved. (R. 420).

From summer of 2011 to July 7, 2012, Mr. Kirkwood had no emergency room visits. (R. 41-42). On July 7, 2012, Dr. Muhammad Rafiq, M.D., completed an Internal Medicine Consultative Examination, arranged by the Bureau of Disability Determination Services. (R. 559-570). Dr. Rafiq spent twenty-six minutes with Mr. Kirkwood before

writing his report. (R. 559). Mr. Kirkwood complained of a disability due to shortness of breath. (R. 559). Dr. Rafiq observed that Mr. Kirkwood "was not in any acute respiratory distress." (R. 560). He noted that Mr. Kirkwood's lungs were "clear to auscultation and percussion without rales, rhonchi or wheezes." (R. 560). Mr. Kirkwood had no difficulty getting on and off the examination table. (R. 561). He was able to walk "greater than 50 feet without support." (R. 561). He was also able to walk on the toes or heels bilaterally, and he was able to do the heel to toe walk. (R. 561). He was able to stand on one leg bilaterally but was unable to hop on one leg bilaterally. (R. 561). He was able to fully extend his hands, make fists, and oppose the fingers to thumb. (R. 561). The range of motion of the hips, knees, ankles, cervical and lumbar spine was normal. (R. 561). His straight leg raise test was negative bilaterally. (R. 561). Regarding Mr. Kirkwood's mental state, Dr. Rafiq noted that he was alert, oriented, cooperative, polite, pleasant, and had good hygiene. (R. 561). He also observed that there were no signs of depression, agitation, irritability or anxiety. (R. 561). Dr. Rafiq found Mr. Kirkwood was able to manage his own funds. (R. 561). Dr. Rafiq's clinical impressions were that Mr. Kirkwood suffered from emphysema and a learning disability. (R. 562).

In addition to his physical examination, Mr. Kirkwood underwent a pulmonary function test, performed by Dr. Rafiq. (R. 566). A spirograph produced an FEV1 value of 1.55. (R. 565). His height that day was measured at 73 inches. (R. 565). Dr. Rafiq's notes indicated that Mr. Kirkwood had not had a cold recently, but had dizziness and some coughing. (R. 565). Dr. Rafiq indicated that there was no audible wheezing.

(R. 565).  The doctor also noted that during the test, Mr. Kirkwood complained of ear popping, dizziness, and "difficulty breathing – no good.".  (R. 565).

In addition to his pulmonary issues, Mr. Kirkwood also suffers from back and neck pain.  (R. 691, 715-725, 730-742).  On September 5, 2012, a cervical spine and lumbar spine exam revealed degenerative changes without obvious fracture or significant spondylolisthesis.  (R. 715).  On November 26, 2012, an MRI showed "small broad-based central disc protrusion at the C4-5 level contributing to mild central canal stenosis; mild multilevel degenerative disease of the cervical spine; small T2 hyperintensities within bilateral neural foramina."  (R. 717).

### ii.  Mental Impairments

On July 10, 2012, Dr. Kelly Renzi, Psy.D., completed a psychiatric evaluation, arranged by the Bureau of Disability Determination Services.  (R. 571-576).  On the Wechsler Adult Intelligence Scale-IV exam, he obtained a full-Scale I.Q. score of 71, placing him at the low-end of the Borderline Deficient range.  (R. 575).  During the examination, Dr. Renzi found Mr. Kirkwood to be "terse" and "argumentative."  (R. 575).  He also found Mr. Kirkwood demonstrated a low tolerance for frustration and he "genuinely had intellectual deficits."  (R. 575).  Dr. Renzi also noted that Mr. Kirkwood appeared to have limited motivation to learn new abilities and concepts.  (R. 575).  Still, Dr. Renzi opined that if he was awarded benefits, he would be able to handle his own finances.  (R. 575).

On April 3, 2014, Dr. Mark A. Amdur, M.D., performed a second psychiatric evaluation, at the request of Mr. Kirkwood's attorney.  (R. 730-734).  Mr. Kirkwood was administered the Montreal Cognitive Assessment, and he attained a score of 20 out of

30.  (R. 733).  Dr. Amdur noted that his score was "consistent with significant cognitive impairment and also consistent with a history of childhood learning disabilities."  (R. 733).  After reviewing the medical record, Dr. Amdur found his spirometry report from July 2012 was consistent of plaintiff's subjective report of shortness of breath upon minimal exertion."  (R. 733).  Dr. Amdur also noted that throughout the interview, Mr. Kirkwood was restless and shifted positions, "consistent with back and neck discomfort."  (R. 732).  Dr. Amdur diagnosed Mr. Kirkwood with Cognitive Disorder and Intellectual Limitation.  (R. 734).  Dr. Amdur disagreed with Dr. Renzi's psychological evaluation and found "the true value of Dr. Renzi's report is that it demonstrates Mr. Kirkwood's maladaptive coping skills in a setting equivalent to a work setting."  (R. 733).  Additionally, Dr. Amdur found that Mr. Kirkwood's diagnosis of Cognitive Disorder and Intellectual Limitation conveyed significant limits on his ability to understand instructions.  (R. 734).  Dr. Amdur opined that based on his history of homelessness, Mr. Kirkwood was unable to handle his own finances.  (R. 734).

### c.  The Administrative Hearing Testimony

#### i.  Mr. Kirkwood's Testimony

On April 10, 2014, Mr. Kirkwood had his hearing with the ALJ (R. 34).  He testified that he was homeless for eight years before he entered into the LIGHT-House Program.  (R. 73).  He has a few friends from the LIGHT-House program and has one outside friend – "the only sober person he knows." (R. 61).  He admitted that he had an alcohol problem but he has sought counseling through a state counseling program.  (R. 68).  He testified that he prefers to be alone because he "does not trust strangers," and he "can control the situation and move at my own pace." (R. 62-63).

In regards to his physical impairments, Mr. Kirkwood testified that his neck and back pain prevented him from working.  (R. 53).  He complained that he was "always out of breath."  (R. 53).  He stated that he has constant pain and has difficulty breathing when carrying things.  (R. 53).  When asked how far he can walk, Mr. Kirkwood testified that he could not carry a gallon of milk and walk one block without resting every 50 feet.  (R. 53).  He claimed he would have to rest for one minute, standing in one place.  (R. 54).  When asked by the ALJ how long he could stand in one place, he responded "five minutes."  (R. 55).  He testified that after standing in one place for five minutes, he would begin to have neck and lower back pain.  (R. 56).  As far as sitting, he testified that he could sit for five to ten minutes before he would have pain in his neck and lower back.  (R. 56).  To cope with the pain, Mr. Kirkwood took Norco.  (R. 59).  He testified that the Norco "made him sleepy" and as a result, he napped regularly.  (R. 59).

Regarding his daily activities, Mr. Kirkwood testified that he receives assistance with transportation and shopping.  (R. 59).  Without this help, he opined that he would not be able to shop as frequently or get the things he needed.  (R. 60).  He could do housework, but had to do it very slowly and had to stop now and then.  (R. 59).

In addition to his physical impairments, Mr. Kirkwood testified that he cannot read or write.  (R. 60).  He claims he is capable of writing a few words, in English.  (R. 61).  He testified that he was unable to fill out the Social Security forms, and as a result, he had help filling out every single form.  (R. 61).  Due to his illiteracy, he said it took him years to figure out public transportation.  (R. 60).

Mr. Kirkwood also testified about his prior work history.  He stated that over the last ten years, he found people "worked faster" than him and as a result, he has had

problems securing a job. (R. 64). Specifically, he said "I'm not going to last in the workplace, working at the pace I work at now." (R. 64). He testified that every time he was sent out, he was told that he was working too slow. (R. 64). For example, when he was at Elite Temp Service, he found his job, as an assembly man, "too fast-paced." (R. 64-65). He claimed he had to work slowly because of his pain and breathing problems. (R. 65). As a result, he was unable to keep up with the production requirements. (R. 65). At his hearing, he admitted that he was unqualified due to his lungs. (R. 66). He explained that upon exertion, his breathing slows down and "the longer my breathing is slowed down, the longer it takes for me to recover." (R. 66-67).

### ii. The Medical Expert's Testimony

Dr. Carl Leigh, M.D., testified regarding Mr. Kirkwood's physical impairments. (R. 40). Dr. Leigh opined that Mr. Kirkwood had bullous emphysema, "emphysema with little bubbles on the surface of the lungs." (R. 41). Dr. Leigh testified that the medical records indicated Mr. Kirkwood had a history of heavy tobacco usage, amounting to "40 pack-years." (R. 41). He also added that Mr. Kirkwood had a history of pulmonary tuberculosis and shortness of breath, particularly on exertion. (R. 41).

According to Dr. Leigh, the entire physical exam, performed by Dr. Rafiq, was within normal limits, except that Mr. Kirkwood was unable to hop on one leg at a time, either the right or left leg. (R. 42). However, Dr. Leigh's major issue was the pulmonary function test, dated July 7, 2012. (R. 42). Mr. Kirkwood's result was FEV-1 was 1.55, which for his height of 6 feet, 1.5 inches, would be listing-level. (R. 42). According to Dr. Leigh, this test was not performed according to the Social Security Administration program standardization because it was performed while he was coughing, and thus,

did not meet the criteria set forth in 3.00E. (R. 42). Dr. Leigh reasoned because "there were no two tests that were within five percent of each other, we cannot accept that 1.55 liters of the FEV-1 as meeting a listing." (R. 42). Dr. Leigh opined that Mr. Kirkwood would be restricted to a light RFC: occasionally lifting and carrying 20 pounds, frequently 10 pounds; standing or walking six hours out of an eight-hour workday; and no limitation on sitting and postural. (R. 45). He added that Mr. Kirkwood should avoid concentrated exposure to extremes of temperature and humidity, and moderate exposure to the usual respiratory and poor ventilation, noxious odors, fumes, gases, smoke and dust. (R. 45).

Mr. Kirkwood's attorney asked Dr. Leigh whether he considered his back, neck, and musculoskeletal issues to be severe impairment when assessing the RFC assessment. (R. 47). Dr. Leigh responded "Oh. No." (R. 47). Considering the postural restrictions, Dr. Leigh opined that Mr. Kirkwood should be limited from climbing unprotected heights, ladders, ropes; scaffolds and crawling occasionally. (R. 47).

### iii. Ms. Bell's Testimony

Jennifer Bell also testified at the hearing. (R. 77). Ms. Bell has a BSW (Bachelor of Social Work) and has worked at Hesed House for the last seven years. (R. 78). She works in the permanent supportive Housing Program, LIGHT-House, for the chronically homeless. (R. 78). The program provides housing for the chronically homeless with a disabling condition, along with assistance with providing transportation and paying rent and utility bills. (R. 79). At the time of the hearing, she worked with Mr. Kirkwood for the last four years. (R. 78).

Ms. Bell testified that the program uses HUD's definition of chronically homeless to determine who qualifies for the program, "which is four instances of homelessness within the past four years, or one year of continuous homelessness." (R. 79). She stated that in determining whether Mr. Kirkwood qualified, the program obtained medical records from Aunt Martha's and Provena Mercy. (R. 80). According to Ms. Bell, Mr. Kirkwood met the program's qualifications: "he had a disabling condition of tuberculosis and emphysema and he was homeless in the shelter since 2002." (R. 79). Ms. Bell testified that she helps Mr. Kirkwood with grocery shopping, providing transportation, reading, and filling out paperwork. (R. 81). She stated this assistance was different from other clients. (R. 81). She also opined that Mr. Kirkwood "doesn't move around as well as everybody else." (R. 81). Ms. Bell testified that she personally felt Mr. Kirkwood disabled and had breathing problems. (R. 81).

### iv. The Vocational Expert's Testimony

Caroline Ward-Kanize testified as a vocational expert. (R. 82). Before questioning, the VE asked Mr. Kirkwood to confirm his responsibilities as a truck driver. (R. 83). Mr. Kirkwood confirmed that his responsibilities included local driving, and loading and unloading up to 100-pound sacks of potatoes. (R. 83). The VE classified him as SVP 3, semi-skilled, medium. (R. 83). She added that "it's medium according to the DOT; however, Plaintiff indicated he performed it as heavy work." (R. 83).

The ALJ first asked the VE whether the following hypothetical of the same age, education and work experience as Plaintiff, could perform any other work. The individual would be limited to performing light exertional level work as defined in the regulations, except that he could occasionally crawl; could stand and walk up to six

hours in an eight-hour workday; no sitting limitations; could never climb ladders, ropes, or scaffolds. (R. 84). The ALJ further noted that this hypothetical individual would avoid concentrated exposure to temperature extremes and humidity, and even moderate exposure to the typical pulmonary irritants. (R. 84). The VE responded that such a person would not be capable of performing Mr. Kirkwood's past work. (R. 84). The ALJ then asked whether there was other available work for this hypothetical person. (R. 84). The VE stated that Plaintiff could work as a cashier (3,000,000 nationally and 140,000 in Illinois); inspector and hand packager (400,000 nationally and 20,000 in Illinois); or sorter (400,000 nationally and 20,000 in Illinois). (R. 84).

The ALJ next asked whether adding Plaintiff's mental limitations: mild activities of daily living; mild social functioning; moderate concentration, persistence, and pace, precluding fast-paced work; would prohibit the hypothetical person from finding work. (R. 85). The VE responded yes, except for the cashier position because that is dealing with the general public. (R. 85). The VE also added Plaintiff could work in shipping and receiving weigher (69,000 nationally and 2,700 in Illinois). (R. 86). In response, the ALJ asked whether the shipping and receiving position would require written English communication. (R. 86). The VE responded that the hypothetical worker might have to know reading numbers but not necessarily "reading of any language." (R. 86). The ALJ then asked whether the hypothetical person was precluded from housekeeping janitorial work. (R. 87). The VE responded that she did consider it but Plaintiff was precluded due to the exposure to pulmonary irritants. (R. 87).

The ALJ asked whether there would be a reduction in job numbers if we were looking at an employer with production requirements. (R. 88). The VE responded that

there was a possible 50 percent reduction. (R. 88). The ALJ then asked whether there was work when adding the mental limitations and off work more than 20 percent. (R. 88-89). The VE responded no because the hypothetical individual needs to be on task and any more than 10 percent of the workday would preclude competitive employment. (R. 89). Finally, the ALJ asked about tolerated absenteeism. (R. 89). The VE responded one day every three months. (R. 89).

Mr. Kirkwood's attorney asked whether the requirements were more stringent during the probationary period. (R. 90). The VE responded yes, and there would likely be zero tolerance for absenteeism during the probationary period and production requirements would remain the same. (R. 90).

### III.    The ALJ's Decision

On May 13, 2014, the ALJ found that Mr. Kirkwood was not disabled and therefore did not qualify for Supplemental Security Income. (R. 8-28). She believed that Mr. Kirkwood's allegations were "not credible," and reasoned that Mr. Kirkwood had the residual functional capacity (RFC) to perform light work, as detailed by the VE's testimony (R. 19-20).

First, the ALJ concluded that Mr. Kirkwood met the insured status requirements of the Social Security Act through June 30, 2006. (R. 13). Second, the ALJ found that Mr. Kirkwood had not engaged in substantial gainful activity since May 31, 2008. (R. 13). Third, the ALJ found that Mr. Kirkwood had the following severe impairments: emphysema and vertebrogenic disorder. (20 CFR 404.1520(c) and 416.920(c)). (R. 13). The ALJ focused on the testing requirements under Listing 3.02 and the requirements under Listing 1.04, stating that Mr. Kirkwood's emphysema does not fulfill

the testing requirements under Listing 3.02 and his musculoskeletal disorder does not

fulfill the requirements under Listing 1.04.  (R. 15).  The ALJ also found that there was

no evidence that showed a medically determinable impairment of a cognitive disorder

and intellectual limitation.  (R. 14).  She noted that the VE classified Mr. Kirkwood's past

work as skilled, and there was no evidence of school records or cognitive testing to

support his allegation.  (R. 14).  She found Mr. Kirkwood's past alcohol abuse "non-

severe" and a "minimal functional limitation."  (R. 14).

Fourth, the ALJ found that Mr. Kirkwood did not have an impairment or

combination of impairments that met or was equal to the severity of the ones listed in 20

CFR Part 404, Subpart P, Appendix 1 (R. 15).  20 CFR 404.1520(d). 404.1525,

404.1526, 416.920(d), 416.925, 416.926.  Fifth, she found that Mr. Kirkwood had the

residual functional capacity (RFC) to perform simple, routine nature work, based in

demonstration and verbal instructions.  (R. 17).  Mr. Kirkwood was precluded from fast-

paced work and he was to have no contact with the general public.  (R. 17).  She further

found that Mr. Kirkwood was able to lift up to twenty pounds occasionally and ten

pounds frequently; could occasionally crawl; could stand and walk up to six hours in an

eight-hour workday; could frequently climb ramps, stairs, balance, stoop, crouch, and

kneel; could never climb ladders, ropes, or scaffolds.  (R. 17).

In determining Mr. Kirkwood's RFC, the ALJ considered his symptoms and their

severity using a two-step process. (R. 17).  First, she determined whether there was an

underlying medically determinable impairment, and second whether that impairment

could produce Mr. Kirkwood's pain or symptoms.  (R. 17).  The ALJ summarized Mr.

Kirkwood's vocational experience and his disability allegations: inability to work due to

his inability to read or write, lung disease, and "TB." (R. 18). She listed Mr. Kirkwood's medications: inhaler (shortness of breath) and Norco (pain medication). (R. 19). She also summarized Mr. Kirkwood's testimony. (R. 18-19). After considering his testimony, the ALJ concluded that Mr. Kirkwood's medically determinable impairments could reasonably be expected to cause his symptoms; however, his statements about the intensity, persistence and limiting effects of the symptoms were not credible. (R. 19). The ALJ listed a number of reasons why she disbelieved the extent of Mr. Kirkwood's allegations. First, the ALJ said that medical evidence did not support Mr. Kirkwood's allegations as to the severity of his impairments. (R. 19). In 2012, during his internal medicine consultative exam, he stated that he never used inhalers for shortness of breath and denied any emergency room visits for this in the last year. (R. 21). Additionally, Mr. Kirkwood claimed his other medical conditions were not severe enough to make him disabled. (R. 21). He stated he could walk up to 100 feet, stand for up to twenty minutes at a time, and sit normally. (R. 21). He also said he could lift up to twenty-five pounds of weight and climb up to a half a flight of stairs. (R. 21). As a result, she found Mr. Kirkwood's pain and medication side effects did not preclude him from "simple level work." (R. 19). While the ALJ acknowledged Mr. Kirkwood's emphysema, she felt it was accounted for in the RFC with pulmonary restrictions. (R. 24). Similarly, the ALJ pointed out that his back and neck pain was also considered in the RFC as he had been limited to a reduce range of light work. (R. 24). As far as his psychiatric evaluations, the ALJ pointed out that Mr. Kirkwood denied depression but talked about "a dismal life and inability to work." (R. 23).

The ALJ pointed out his daily activities and his ability to cook, vacuum, shop, bathe, and dress independently. (R. 21). She also found that the medical evidence did not support his social limitations and ability to maintain pace at work. (R. 19). The ALJ considered Ms. Bell's testimony when assessing Mr. Kirkwood to light work versus medium work with the environmental limitations outlined above. (R. 25). The ALJ believed that her testimony was in conflict with the medical evidence. (R. 25). The ALJ reached this conclusion due to the medical evidence and Ms. Bell's credentials. (R. 25).

The ALJ considered the VE's testimony. She noted that at one point, Mr. Kirkwood ran his own business, which the VE opined was semi-skilled in nature. (R. 20). However, taking into account his education and his complaints of pain, she restricted Mr. Kirkwood to simple, routine nature work, based in demonstration and verbal instructions. (R. 20). Based on the VE's testimony, the ALJ found there were significant numbers of available jobs for Mr. Kirkwood: inspector, DOT#559.687-074, citing 20,000 jobs locally and 400,000 jobs nationally; a sorter, DOT#573.687-034, citing 20,000 jobs locally and 400,000 jobs nationally; shipping and receiving weigher, DOT#222.387-074, citing 2,700 jobs locally and 69,000 jobs nationally. (R. 24, 26). Moreover, given his education level and past employment, the ALJ found Mr. Kirkwood was able to read and understand English. (R. 27). Consequently, she found Mr. Kirkwood not disabled and not entitled to benefits under the Social Security Act. (R. 27-28).

## IV.	Discussion

### a.  The Standard of Review

The court must affirm the ALJ's decision if it is supported by substantial

evidence.  42 U.S.C. § 405(g); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

Substantial evidence refers to "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *Curvin v. Colvin*, 778 F.3d 645, 648 (7th

Cir. 2015) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).  The

standard of review is deferential, and the court may not reconsider facts and evidence.

*Elder v. Astrue*, 529 F. 3d 408, 413 (7th Cir. 2015); *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000).  The ALJ must "minimally articulate" the reasons for her ultimate

conclusion by building an "accurate and logical bridge" from the evidence to the

conclusion.  *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *Zurawski v. Halter*,

245 F.3d 881, 887 (7th Cir. 2001); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  If

the ALJ's decision "lacks evidentially support" or is so poorly articulated as to prevent

meaningful review, the case must be remanded.  *Steele v. Barnhart*, 290 F.3d 936, 940

(7th Cir. 2002).

### b.  The Five-Step Sequential Analysis

Disability is defined as an "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Social

Security Regulations provide a five-step sequential inquiry to determine whether a

plaintiff is disabled. 20 C.F.R. § 416.920(a)(4). If at any step the plaintiff is found not

disabled, the claim does not need to be reviewed any further. *Id.*

1) Is the plaintiff engaged in substantial gainful employment? 20 C.F.R. § 416.920(a)(4)(i). If yes, the claimant is not disabled. If no, the judge continues to the next step. 20 C.F.R. § 416.920(b).

2) Does the plaintiff have a severe medically determinable impairment or combination of impairments? 20 C.F.R. § 416.920(a)(4)(ii). If no, the claimant is not disabled. If yes, the judge continues to the next step. 20 C.F.R. § 416.920(c).

3) Does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations? 20 C.F.R. § 416.920(a)(4)(iii). If yes, the claimant is disabled. If not, the judge continues to the next step. 20 C.F.R. § 416.920(d).

4) Does the claimant have the RFC to perform his past relevant work? 20 C.F.R. § 416.920(a)(4)(iv). If yes, the claimant is not disabled, and if no, the judge continues to the final step. 20 C.F.R. § 416.920(f)-(h).

5) Given the claimant's RFC, can he do any other work in the national economy? 20 C.F.R. § 416.920(a)(4)(v). If yes, the claimant is not disabled, and if no, the claimant is disabled. *Id.* In order to show that an individual is not disabled at this step, the ALJ has the burden to prove that the work that the claimant can perform, taking into account his RFC, exists in significant numbers in the national economy. 20 C.F.R. § 416.920(g)-(h).

### c. Analysis

Mr. Kirkwood makes three main arguments for reversal. First, he argues that the

ALJ erred in finding his impairments do not meet Appendix Listing 3.02(A). Second, he

contends that the ALJ improperly weighed the medical opinions, rejecting the opinion of

his treating and examining doctor. Third, he claims that the ALJ improperly evaluated

his credibility. The second and third claims are interrelated. The thesis of the ALJ's

argument about the weight of medical evidence is that the ALJ gave substantial weight

to the medical expert's opinions because "he was familiar with the disability program

and had had the opportunity to review and evaluate the entire record." (R. 25). Thus,

the ALJ's credibility determination is central to his decision, as it often is in these cases.

## 1.  Impairments under Appendix Listing 3.02(A)

Mr. Kirkwood's main and most important criticism of the ALJ's decision is that the ALJ incorrectly determined at step 3 that his emphysema did not meet Appendix Listing 3.02(A).  He contends that he satisfied the listing requirements set forth in Section 3.02(A), and that the ALJ's finding was contrary to the plain language of the listing.

"Under a theory of presumptive disability, a claimant is eligible for benefits if [he] has an impairment that meets or equals an impairment found in the Listing of Impairments."  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1).  The "burden of proof at step 3 rests with the claimant, and the ALJ has no duty to analyze equivalence when the claimant presents no substantial evidence of it."  *Eskew v. Astrue*, 462 F. App'x 613, 616 (7th Cir. 2011); *Scheck v. Barnhart*, 357 F.3d 697, 700-01 (7th Cir. 2004); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

Under listing 3.0(A):

> [W]hen an individual has a medically determinable impairment that is not listed, an impairment which does not meet a listing, or a combination of impairments no one of which meets a listing, we will consider whether the individual's impairment or combination of impairments is medically equivalent in severity to a listed impairment. Individuals who have an impairment(s) with a level of severity which does not meet or equal the criteria of the listings may or may not have the residual functional capacity (RFC) which would enable them to engage in substantial gainful activity. Evaluation of the impairment(s) of these individuals will proceed through the final steps of the sequential evaluation process.

20 C.F.R. § 404 app. 1, § 3.00(A).

Under listing 3.02(A), if a person suffering from emphysema has a forced expiratory volume in one second (FEV1) at a particular value, he automatically qualifies

for benefits. 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 3.02(A). Specifically, the table articulates forced expiratory volumes ("FEV") that correspond to claimant's height, without shoes. 20 C.F.R. § 404 app. 1, § 3.02(A). A person's FEV1 "is measured through use of an instrument called a 'spirograph' both before and after the patient inhales a 'bronchodilator' medication." *See* § 3.00(E); *Eskew v. Astrue*, 462 F. App'x 613, 615 (7th Cir. 2011). "Both measurements produce FEV1 values, but only the highest post-bronchodilator result is used to assess the severity of the respiratory impairment." *See Eskew v. Astrue*, 462 F. App'x 613, 615 (7th Cir. 2011). If claimant's FEV is below the level corresponding to their height, the person is considered disabled. 20 C.F.R. § 404 app. 1, § 3.00(E). For a person of Mr. Kirkwood's height, 73 inches, an FEV1 value at or below 1.55 qualifies for benefits. *See* § 3.02(A) tbl.1; (R. 565).

The record indicates that in July 2012, Mr. Kirkwood underwent one pulmonary function test and a spirograph repeatedly produced an FEV1 value of 1.55. (R. 567). According to the report summary, Mr. Kirkwood had five pre-bronchodilator tests performed: three were found acceptable and zero were found reproducible. (R. 567). Mr. Kirkwood had six post-bronchodilator tests performed: zero were found acceptable and two were found reproducible. (R. 567). Physician notes revealed that during the exam, Mr. Kirkwood felt dizzy and had difficulty breathing. (R. 565). Although there was some coughing noted, Dr. Rafiq noted that there was no audible wheezing, and Mr. Kirkwood had a fair effort, cooperation, and comprehension. (R. 565). Additionally, under the comments section, Dr. Rafiq wrote: "Patient states ears are popping, dizziness, difficulty breathing. No good." (R. 565). Based on these results, the ALJ

concluded that Mr. Kirkwood's emphysema did not "manifest clinical signs and findings that meet the specific criteria of any of the listings." (R. 15).

She reasoned that the testing did not meet the criteria set forth in Section 3.00(e) because "there were no two tests within 5 percent of each other." (R. 14). The ALJ acknowledged that she gave "very substantial weight to the opinions of the medical expert, since he was familiar with the disability program and has had the opportunity to review and evaluate the entire record, including both the written documentation and hearing testimony." (R. 25). The medical expert, of course, had opined that the test was unacceptable because it was performed while Mr. Kirkwood was coughing, and no two test results were within 5% of each other.

The ALJ's reasoning leaves the Court in the dark in attempting to determine the ambiguities in Mr. Kirkwood's spirometry report. Under listing 3.0(E): "[P]ulmonary function studies should not be performed unless the clinical status is stable (e.g., the individual is not having an asthmatic attack or suffering from an acute respiratory infection or other chronic illness). Wheezing is common in asthma, chronic bronchitis, or chronic obstructive pulmonary disease and does not preclude testing." 20 C.F.R. § 404 app. 1, § 3.00(E). Here, Dr. Rafiq's notes indicated that Mr. Kirkwood felt dizzy, had difficulty breathing but no audible wheezing. (R. 565). So, Dr. Rafiq performed the test. As a consultative examiner paid by the disability agency, he is presumably familiar with the protocol for performing tests and went ahead with the study. As such, the "coughing" note is most likely a record of Mr. Kirkwood's report of his health over the prior three weeks, which is what the doctor asked him. (R. 565). So, contrary to Dr. Leigh's take – and the ALJ's – it's unlikely Mr. Kirkwood was coughing during the test.

Then, there is the 5% rule. The confusion here is due to the byzantine structure of the listing. The listing speaks of test results being satisfactory and requiring that two satisfactory test be reproducible, with reproducible meaning that the value does not differ from the largest value by more than 5%. The test here indicates that there were three "acceptable" pre-medication tests, with none being reproducible, and no acceptable post-medication tests, with two being reproducible. (R. 567). Dr. Leigh simply states that "there were no two tests within 5 percent of each other" but that's not what the listing -- 20 C.F.R. § 404 app. 1, § 3.00(E) – requires. In other words, we don't know if Dr. Leigh even considered whether there were two tests with 5% of the highest value.

The Commissioner submits that Dr. Leigh's opinion is bolstered by the findings of the two state agency physicians that reviewed the record. But Dr. Smith didn't mention any pulmonary function studies (R. 578-85) and Dr. Madala said "pulmonary function test is above listing levels but does show an obstruction." (R. 699). Notably, that's the opposite of what the Commissioner claims he said, that the test "did not show an obstruction" [Dkt. # 16, at 4], and is truly curious given the fact that *every* FEV1value was *below* listing level. (R. 567). As such, there isn't really anything of value from the reviewing physicians that supports the medical expert's testimony.

**Weight of medical opinions**

Mr. Kirkwood's secondary contention is that the ALJ failed to provide a legally sufficient reason for rejecting the opinion of his treating physician, Dr. Mark Amdur, M.D. Instead, the ALJ gave "very substantial weight" to the state agency physician, Dr. Leigh, because "he is familiar with the disability program and has had the opportunity to review

and evaluate the entire record."  (R. 25).  For the reasons described below, the ALJ's rationale does not pass muster.

The ALJ committed reversible error by failing to consider all relevant evidence in the record.  A treating physician's opinion is entitled to controlling weight as long as it is well supported by medical findings and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010).  Since the ALJ declined to give Dr. Amdur's opinion controlling weight, she was required to provide a "sound explanation" and "good reasons" for not doing so.  *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Campbell v. Astrue*, 627 F. 3d 299, 306 (7th Cir. 2010); *Zblewski v. Astrue*, 302 F. App'x 488, 493 (7th Cir. 2008).  The ALJ must consider various factors, including: (1) the examining relationship; (2) the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) consistency of the opinion with the record as a whole; (5) the treating source's specialization; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Here, the ALJ's decision does not allow us to conclude that she weighed the merits of Dr. Amdur's opinion, nor has she provided the requisite "sound explanation" for not giving controlling weight.  In fact, she has given us no explanation, other than giving substantial weight to the Dr. Leigh because of his supposed familiarity with the disability program.  (R. 25).

But that "rationale" essentially presumes the validity of his conclusions, thereby in effect, making them unreviewable. In addition, it puts out of view the opinion of the consulting physician who was equally familiar with the program in which Dr. Leigh was

thought by the ALJ to be so knowledgeable that his opinion was superior to anyone else's. Although Mr. Kirkwood does not have a long history with Dr. Amdur, his observations were consistent with the medical record, Mr. Kirkwood's testimony, as well as some of the opinions of stage agency physicians.  For example, even though Dr. Amdur disagreed with Dr. Renzi's psychological evaluation, both agreed that Mr. Kirkwood genuinely has intellectual deficits, along with maladaptive coping skills.  (R. 575, 733).  Furthermore, Mr. Kirkwood's testimony, concerning his breathing difficulties, was supported by his history of care at Provena Mercy Center.  (R. 336-413).

Therefore, the logical bridge between the record evidence and the ALJ's conclusions is missing.  *See Roddy v. Astrue*, 705 F.3d 631 (7th Cir. 2013).  On remand, if the ALJ elects not to give controlling weight to Dr. Amdur's opinion and provides good reasons for doing so, she must still evaluate the required regulatory factors and provide a "sound explanation" for whatever weight she gives to those opinions.  *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

## 2.  The Credibility of Mr. Kirkwood

Mr. Kirkwood's third criticism of the ALJ's decision is that the ALJ incorrectly determined that he lacked credibility, without substantial evidence to support that determination.  The ALJ found that Mr. Kirkwood lacked credibility for three reasons: the medical expert's testimony, the nature of his treatment, and his daily activities.  (R. 25).

Reviewing courts should give deferential treatment to the ALJ's credibility determination, only overturning it if it is "patently wrong."  *Jones v. Astrue*, 623 F.3d 1155, 1160, 1162 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).  In other words, the ALJ's

credibility determination should only be overturned if it was unreasonable or unsupported. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).[2]

When reviewing the ALJ's credibility determination, the court needs to ensure that it was supported by the evidence and specific enough for a "reviewing body" to understand the ALJ's reasoning. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). In assessing Mr. Kirkwood's credibility, the ALJ employed the familiar (and meaningless) boilerplate, or template, that the Seventh Circuit has criticized repeatedly: "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 19).

This says nothing. As the Seventh Circuit has repeatedly held, the cart-before-the-horse phrasing is flatly wrong.  *See e.g.*, *Moore v. Colvin.* 743 F.3d 1118, 1122 (7th Cir. 2014) ("We have repeatedly condemned the use of that boilerplate language

---

[2] The word "credibility" is used as a convenient short hand for the ALJ's assessment of Mr. Kirkwood's allegations about his symptoms and limitations.  **Error! Main Document Only.**The Social Security Administration recently updated its ruling on how ALJ's should assess a claimant's allegations, replacing Social Security Ruling 96-7p with Social Security Ruling 16-3p. Under the new ruling, ALJs will no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the applicant's] symptoms."  SSR 16-3p, 2016 WL 1119029 (March 16, 2016). "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole*, – F.3d –, –, 2016 WL 3997246, at *1 (emphasis supplied). Nothing else has changed, however; an ALJ must still provide good reasons for rejecting a claimant's assertions as to their pain and limitations. SSR 16-3p, 2016 WL 1119029, at *7. In this case, rejecting the Claimant's allegations, the ALJ did not go into Mr. Kirkwood's character, so the new ruling does not come into play.

because it fails to link the conclusory statements made with objective evidence in the record."); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) ("It puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion.").

Here, at least, the ALJ provided some rationale for her assessment of Mr. Kirkwood's credibility. But one leg is flawed and the other is not able to stand on its own. In her decision, the ALJ pointed out Mr. Kirkwood's daily activities and his ability to cook, vacuum, shop, bathe, and dress independently. (R. 21). She also found that the medical evidence did not support his social limitations and ability to maintain pace at work. (R. 19). While the ALJ mentioned Mr. Kirkwood's daily activities, she did not say what she made of them. She noted that Mr. Kirkwood performed these activities at his own pace due to his pain, shortness of breath, pain medications, and cognitive limitations. (R. 24). In other words Mr. Kirkwood could not do the things the ALJ mentioned – like vacuum or shop – on a sustained basis or without some assistance. As such, it's not clear how the ALJ got from that point to thinking Mr. Kirkwood's activities undermined his claims that he couldn't work on a regular schedule. *See, e.g.*, *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."); *Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004) ("[Claimant] does not claim to be in wracking pain every minute of the day. When she feels better for a little while, she can drive, shop, do housework. It does not follow that she can maintain

concentration and effort over the full course of the work week."); *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014) ("We previously have acknowledged that a claimant's election to undergo serious treatment, such as having surgery and taking 'heavy doses of strong drugs,' indicates that the claimant's complaints of pain are likely credible.").

That leaves the medical record as support for the ALJ's finding, and it is not legally sufficient. Seventh Circuit case law does not allow an ALJ to base a credibility finding on the medical evidence alone. *See, e.g.*, *Moore v. Colvin.* 743 F.3d 1118, 1125 (7th Cir. 2014); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

Additionally, the ALJ committed reversible error by failing to consider all relevant evidence in the record. In her decision, the ALJ noted that "new probative evidence has been received since the state agency medical consultants formulated their opinions, and which they consequently never had the opportunity to review and evaluate." (R. 25). We are only told that this new evidence contains "radiological evidence of degenerative changes in the cervical and lumbar spine," and that Mr. Kirkwood "was treated for back and neck pain." (R. 25). However, the ALJ did not request a new consultative exam to determine the relevance of the evidence or its impact, if any, on Mr. Kirkwood's RFC. Instead, she decided, on the basis of the new evidence, that "a further narrowing of the claimant's residual functional capacity [was] warranted." (R. 25). Again, the Court is left in the dark in attempting to determine how the ALJ applied this new medical evidence to reach her conclusion regarding Mr. Kirkwood's RFC. It does not appear to be supported by the medical expert or any of the state agency consulting physicians. By basing her decision on the "benefit of the doubt" rather than

on medical evidence, the ALJ did not build the necessary logical bridge between her RFC finding and the medical evidence. This constitutes reversible error because the ALJ's "failure to submit new and potentially decisive medical evidence to medical scrutiny . . . allows the ALJ to impermissibly play doctor, which the Seventh Circuit has emphasized is a 'clear no-no.' " *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014).

Moreover, the ALJ failed to explain how the "new probative evidence" mandated a narrowing of Mr. Kirkwood's residual capacity, but did not affect his restrictions. This logical leap is concerning, because the "new probative evidence" includes radiological imaging and treatment notes documenting Mr. Kirkwood's back and neck pain. If the medical evidence was sufficient to warrant narrowing Mr. Kirkwood's residual capacity, the ALJ was required to explain why Mr. Kirkwood's musculoskeletal disorder did not fulfill the requirements in Listing 1.04. The ALJ's failure to do so is the type of cherry-picking of medical evidence that the Seventh Circuit has held is impermissible. *See Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

In this case, the ALJ's decision was not specific enough for this court to trace the path of her reasoning. It is well established that "an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain." *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015). Moreover, "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96—7p(4), 1996 SSR LEXIS 4; *see, e.g.*, *Pierce v. Colvin*, 739 F.3d 1046, 1049—50 (7th Cir. 2014); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). As such, the ALJ's opinion

must be reversed on this issue as well, and remanded to determine how the new evidence affects Mr. Kirkwood's manipulative restrictions.

Although not addressed in the briefs, we are also troubled by the ALJ's determination that someone, with an eighth-grade education, who cannot read or write, is capable of performing the following jobs: inspector, DOT#559.687-074; sorter, DOT#573.687-034; shipping and receiving weigher, DOT#222.387-074. (R. 24, 26). Perhaps that can. But the ALJ is required to consider a claimant's education and work experience, which includes literacy and length of education. 20 C.F.R. § 404.1560(c); 20 C.F.R. § 404.1564(b). As the Social Security regulations explain, "Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. § 404.1564(b)(1).

The Seventh Circuit has elucidated that an illiteracy determination is a "highly fact bound question"; a claimant "need only be able to read and write well enough to be able to hold simple, unskilled jobs." *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987) (upholding the ALJ's determination that the claimant was literate despite the fact that the ALJ did not elaborate upon this finding). Here, the ALJ determined that Mr. Kirkwood was able to read and understand English due to his education level and past employment. (R. 27). We are troubled by this because it is contrary to Dr. Amdur's opinion (R. 734); and the testimonies of both Mr. Kirkwood (R. 60-61) and Ms. Bell (R. 81). It is also contrary to information listed in the agency-requested reports. (R. 257-271, 292-301). Thus, the ALJ's reasoning is not credible,

and ignores objective evidence. Certainly, an ALJ may not ignore entire lines of contrary evidence or selectively consider medical reports. *Myles v Astrue*, 582 F3d 672, 678 (7th Cir. 2009); *Terry v Astrue*, 580 F3d 471, 477 (7th Cir. 2009).

Finally, one other aspect of the vocational evidence is troubling. The ALJ determined that Mr. Kirkwood had a moderate restriction on his ability to maintain concentration, persistence and pace. The ALJ accounted for this restriction by finding Mr. Kirkwood unable to perform "fast-paced work such as an assembly line nature . . . ." (R. 17). The Seventh Circuit has questioned whether a restriction against fast-paced assembly line work can serve as a proxy for a moderate limitation in concentration, persistence and pace. *O'Connor–Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016). Compounding the issue is the fact that the vocational expert testified that such a limitation would reduce the available job numbers by 50%. It wasn't clear where that reduction number came from – she said it would vary from employer to employer and she didn't know what specific production requirements might be. (R. 91-93). The basis for the starting point in numbers of jobs is suspect in the first place, *see Herrmann v, Colvin*, 772 F.3d 1110, 1112-13 (7th Cir. 2014), and only becomes more so when we don't know where the 50% adjustment comes from. The vocational expert also testified that the jobs she cited would not allow a person to be off task more than 90% of the time. (R. 60). But how would a moderate impairment in concentration, persistence, and pace fit in with that. Again, as the Seventh Circuit has explained, "[i]f a moderate impairment on maintaining concentration, persistence, and pace equates to being off task at least 15% of the time then, according to the vocational expert, [plaintiff] is essentially unemployable. *O'Connor–Spinner*, 832 F.3d at 699. But we don't know the

answers to any of these questions because, once Mr. Kirkwood's counsel tried to venture down these paths at the administrative hearing, the ALJ blocked his way. (R. 91-99).

## Conclusion

Mr. Kirkwood asks that the court remand this matter, not merely for further proceedings, but with instructions to calculate and award benefits. This is within the court's power under 42 USC §405(g), but is only appropriate "if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion — that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). We cannot say that is the case here, because remand is prompted not by the ALJ's decision being necessarily wrong, but by her failure to adequately articulate and support her conclusions.

This matter must be remanded to the Commissioner for another look at Mr. Kirkwood's application for benefits.

**ENTERED:**_____

**UNI       E JUDGE**

**DATE: 4/20/17**